This time, we'll hear certain underwriters at Lloyd's versus the Insurance Company of the Americas. Thank you. Good morning. Good morning, Your Honors. And if it may please the Court, I'm Phil Lurie, Jr. of Lurie & Lurie, and we represent Insurance Company of Americas, or the appellant in this case. This is an appeal of a district court decision that vacated on evident partiality grounds an arbitration award based on the alleged evident partiality of a party-appointed arbitrator. And it did so in a situation where the only arbitrator qualification that bore on partiality was that the arbitrators would not be disinterested. So there are essentially two issues before the Court, and the first is what standard should this Court apply in a situation where you're faced with an evident partiality claim against a party-appointed arbitrator, but you do have in the arbitration agreement a requirement of disinterested, which means essentially not interested in the outcome of the arbitration. Mr. Lurie, let me, if I can, just focus you on what's concerning me about this. If we take Judge Broderick's findings and his recitation of the things that Mr. Campos omitted disclosing when he had at least a number of opportunities to do so, aren't we just opening, and we're saying that's insufficient for however we want to characterize it. We're putting it under the impartiality hook. Aren't we just opening the door for people who are admittedly affiliated with the side that asked them to be the arbitrator and help pick the neutral? Aren't we just opening the door for them to say, well, I don't have to say this stuff because the Second Circuit has said in certain underwriting, well, it doesn't matter if we don't disclose this stuff so that the other side can ask us about the nature of our affiliation because when it comes right down to it, that's going to be insufficient to disqualify me. Your Honor, the thing that I think we need to keep in mind here is that disclosure or nondisclosure in and of itself is not really the important thing when it comes to an evident partiality claim. It is very important in terms of vetting conflicts and giving parties an opportunity to waive an objection to an arbitrator, and in most cases, the arbitrator is a neutral arbitrator. This is a tripartite reinsurance agreement that we're talking about here, and the law in New York and the law in other federal circuits, as we've cited in other cases, is that there's a presumption in this type of instance that the party appointed arbitrators don't have to be impartial. I understand that, but I understood Judge Hall's question to be on a completely different subject, and that is, if a person . . . what is the consequence of nondisclosure? Well, I think . . . And if there's no consequence of nondisclosure, then you have a real advantage by just saying, I don't know these people. I never saw them before in my life. Your Honor, the consequence of nondisclosure is . . . I mean, there are reputational consequences that . . . Well, you were talking about the opportunity to waive. Well, yeah, and . . . If a person . . . first of all, we're talking about party appointed arbitrators, so there is no neutral yet, because only when they're appointed will the neutral be appointed. So who decides whether a person is disqualified based on what it is they disclose? Well . . . Under your contract. Well, okay, under this contract, what actually happened was that the arbitrators were appointed by each party, and the usual case there is that if you look at the arbitrator qualifications, and if they're met, then everything is okay. These were disclosures that were made by all three arbitrators, including the neutral, at the outset of the arbitration. When these disclosures were made, because it is only when the two party arbitrators are appointed that they get together to decide who the neutral will be. So, basically, the disclosure is made to the opposite party, and you're . . . you referred to waiver, a waiver of a conflict, and presumably you can't decide whether to waive a conflict unless you know whether there is one, and what the nature of it is, and isn't that the purpose of the disclosure requirement? Well, I know that . . . Well, that is the purpose of the disclosure requirement as it applies to neutrals, and that's all the cases that deal with the disclosure requirement deal with the neutral arbitrator. You're the one who referred to waiver. Well, yeah, and I was trying to give, you know, an explanation of why you have it in the context of neutrals, the commonwealth quoting type of disclosures. That's not the question. I thought Judge Hall was asking why do you have it in the context of party arbitration. Well, that is something I think that has arisen in practice, but it doesn't necessarily . . . I'm not quite sure that I see it as applying in the way that you're suggesting is that you need it before the neutral is appointed. Generally, it's when . . . I'm sorry. Please, go ahead. I have a couple of concerns that I think are related, but a little distinct from what my colleagues have asked you about. Here, there didn't have to be complete impartiality, but the agreement said the arbitrator had to be disinterested, which even on its most general definition means no financial stake, no control. As I understand the facts as they ultimately came out through the auditor's report, ICA leased employees and got technical services from Venture. So Venture's CEO, Compos, is the arbitrator without disclosing that his business gets business from ICA, namely the leasing of employees and technical services. That doesn't sound disinterested to me. What am I missing? Well, it's disinterested in the outcome of the arbitration. There's a difference between a business . . . Well, the ICA is, if an adverse ruling to ICA could at some levels affect the business relationship between ICA and Venture. Well, in terms of the relationship itself, too, we have to keep in mind that the numbers that were used by underwriters, they referred to the leasing of employees and payroll. That's Venture's business. They do that with all of their customers. But Mr. Compos told . . . his statement was there was no relationship whatsoever between these entities, and that seems not to be supported by the record. He may not . . . The other thing I have is that ICA's secretary treasurer, Rios, if I understand it, at least through 2016, served as Venture's chief financial officer. So basically, Compos would be assessing the credibility of his own chief financial officer. And there seems to be something in the precedent about these three-party . . . or these three arbitrator panels that suggests that when the neutral is picked, he's entitled to know what the relationship of the other arbitrators to the parties are. So, of course, if a union picks its official to be its arbitrator, the third party knows that he's got that interest. Here, as I understood it, the so-called neutral arbitrator did not know that Rios was Venture's CFO, and therefore factor that into his assessment of Compos' evaluation of the credibility of Rios. Well, yes, Your Honor. An offer was made, as I understand it, from . . . to Compos . . . not to Compos, to Rios, to act essentially as a stand-in financial officer for a period of time. And that . . . Well, it wasn't much of a relationship. Not that there was no relationship. I'm asking you why that wasn't a matter that, even though you can have an affiliated arbitrator, should have been disclosed. I mean, I think that is something that the Sphere drank court brought up as well. But there, again, you have to have a situation where there's some evidence that that would have . . . that this was prejudicial in the sense that it would have caused a different outcome in the arbitration because maybe the umpire would have looked at deliberations in a different way. And I don't think there's any evidence . . . Well, that's the problem I was having when we look at the issue of bias. I mean, speaking for myself personally, I have no problems with affiliation. My problem is with the nondisclosure. And if we agree with you, we are essentially acceding to nondisclosure because, as Judge Broderick pointed out in his decision, there were numerous opportunities for Compos to disclose affiliations. There were . . . Judge Radji has pointed out there were reasons for doing that. Yeah, we'll assume this person is affiliated . . . sorry, is aligned with you in some way. That's why you picked him or her. But let the parties and the other arbitrators know what those affiliations are. I think that that is a problem that I think is dealt with quite well, as I said, with the reputational interest that arbitrators have. But unfortunately, the people in the middle of this dispute don't get to decide on the basis of that record. And there's nothing in the record, though, that shows that that made any difference. And that's not evident partiality. That's exceeding powers, if anything. And I don't know that there's no evidence. I'm aware of the record that doesn't support that. Why isn't the failure to make basic disclosures evidence of partiality? And therefore, evident partiality. Your Honor, that's certainly true in the context of a neutral where there's an expectation of impartiality. When you get to the party-appointed arbitrator situation, you don't have expectations of impartiality. Here we had expectations of disinterestedness. But there's no showing in the record that the arbitrator had an interest in the outcome. I mean, there's these questions that follow up on what Judge Jacobs just asked. He was asked a question about affiliations, and he denied having any. And why isn't that, which seems to have some problem with comporting with the truth, why isn't that evidence of partiality? Sufficient evidence of partiality, at least for a district court. I mean, there's a real issue, too, here as to did he know about the fact that ICA happened to be a customer of his $750 million payroll business? Not his, by the way. He's an officer. He's the CEO of the company. He's, yeah, he's. That's right. And his CFO is the secretary-treasurer of ICA. Let me clarify a few things on that, though. Who knows if he knew that they had any affiliations? Seems somewhat disingenuous. It's not disingenuous when you consider that these, whatever these relationships, these P-O relationships that venture and ICA had were, number one, they were not worth hundreds of thousands of dollars. There's only going to be a small percentage of the payroll. The payroll price is what underwriters say the value of the contract is. It's not that. It's a small amount. But, you know, the issue with this sort of thing, really, it boils down to is there really, is there any prejudice? What is the premise for having discovery? Is it something in the contract? Is it something in the RAS rules? Is it something in the custom of the industry? What's the premise for it? The premise for disclosure in this case, in this case. Well, that's the only time we've got today. That's right, Your Honor. But the premise is that it's basically to get the neutrals to disclose. That's one. Okay. Now, it may serve a purpose. What would have been violated if there had been no disclosure at all by anybody? Just go here, this is my person, this is your person, pick a neutral. What is the premise? Why have this discovery at all? I don't mean the purpose. I mean why is it conducted? Is it required by a rule? Is it required by the contract? It's not, in this case, it's not required by any rules because there were no rules that applied. You know, so it's become a custom of sorts in reinsurance arbitrations, as you know, that everybody makes disclosures and they disclose. It's invariable, isn't it? Well, not necessarily. That's not necessarily. It's just a strange case for reinsurance because I don't think any of these arbitrators, other than Mr. Clegg, were regular reinsurance industry or arbitrators. Yes, and, therefore, harm to Mr. Campos's reputation as an arbitrator is not a factor. Well, no, it would be a factor because. . . It would be a factor if he retired. I mean, if you look at the. . . I'm sorry, Your Honor. It would be a factor if he retired and decided to become an arbitrator. This seems to be a one-off for him. Well, if you look at the Spear-Drake decision, it had to do with an arbitrator, Ron Jacks, but he, too, didn't disclose certain things. But as it turned out, whatever he didn't disclose did not provide a basis for an evident partiality finding, in part because he was not supposed to be a neutral arbitrator. He was a party-appointed arbitrator. And at the end of the decision, Judge Easterbrook said that, well, it may sully his reputation for a candor or something like that, but it doesn't establish evident partiality. In a case where there's no showing that the umpire was prejudiced by any of this. The logic of your position is that the only legitimate question that could be asked in the disclosure process is, do you have a financial interest in the outcome of this arbitration? No, I disagree with that, Your Honor, because I see disclosure and evident partiality. Disclosure can be much broader than evident partiality. What's the purpose of it, then? Well, the purpose of it, then, is people like to know what is possible. It's not curiosity. Well, it's not curiosity, but it creates, I guess, a feeling among everybody that everybody has disclosed everything that might possibly. But does it create a record that the neutral arbitrator can consult in deciding what weight to give the counsel that the neutral is receiving from this party arbitrator or the other? And that, Your Honor, that's exactly what Sphere Drake said, and I agree with that. But here, there is no showing that it would have changed anything. There's no prejudice. How does that showing get made? Well, you know, there would have to be some indication somewhere. The neutral comes in and says, if I'd known this, I wouldn't have changed my mind? Well, the neutral did know about these allegations when they were made later because it was shared by the arbitrator, with the arbitration panel, and nothing was said. And this is a case, too, where you don't maybe look at the result and say to yourself, well, is this really off-the-chart result, or is this just an interpretation of the contract? You know, that would be the other factor. So you have to look at all this. Under the FAA, we're talking about vacating an award. And, you know, in the Cole case, and, you know, this Court has said that you've got to show that by clear and convincing evidence. And there basically has to be certain that there was an egregious breach of the arbitration agreement, warranting vocateur under Section 10. Thank you. You've reserved up. Thank you. Thank you. May it please the Court. Timothy Stalker for the underwriters involved in this matter. We believe that Judge Broderick applied the proper standard under the FAA when he vacated this award and found evident partiality. Before I get into my full argument, I would like to address one or two things that counsel mentioned, and that is disclosure. I've been involved in reinsurance arbitrations longer than I want to admit, but at least 30 years as counsel, as in-house counsel, and as panel member, either as a party-appointed arbitrator or as an umpire. We disclose. We disclose our relationships with the counsel. We disclose our relationships with the parties. And we disclose our relationship with the subject matter. But the question is whether that disclosure is made for one's personal reputation and honor or whether it is something that is required by a contract or by governing rules, if there are any governing rules. It is required by the contract, which requires disinterested members of the panel. It is required by industry custom and practice. It's required by the ARIAS rules. It's required by the AAA. It's required in our industry. Does this contract say it's governed by the ARIAS rules? It does not. It does not. However, at the very beginning of this matter, at the organizational meeting, ICA's counsel, when he commenced his questioning of the panel members, stated, and this is in our brief, stated, that disinterested, like, and I'm paraphrasing, but disinterested as contained in the ARIAS rules. So he alluded at the ARIAS rules form a gloss for the procedure that takes place. Correct. Correct. Correct. So in this matter. Your adversary made a point that there's a big difference between the level of interest that's permitted to a neutral and the level of interest that's permitted to a party arbitrator. They do different things. And the consequence of nondisclosure by a neutral is profound. And that seems to be the kind of case that Judge Broderick was relying upon in his opinion. Whereas we're talking about something different. We're talking about people who will probably advocate inside the roving room, as it were. They do advocate. Both sides advocate. However, they're also part of the overall process to come to a reasonable result. In other words, what I'm trying to say, both sides advocate. And sometimes one side advocates for the other side on a point. But once you appoint a party advocate, arbitrator, if you will, in this case, that person doesn't become the advocate for the entire case. It becomes part of a panel to reach a reasoned award. So I believe we alluded to the Floorsynth case, whereas you're just not merely an advocate. You're part of the process to come to a reasonable and ethical result on the issues in front of you. Why is this not a well-reasoned award, the one that's been set aside by Judge Broderick? Because the whole process was corrupted by evident partiality of their party-appointed arbitrator. Where is that in the record? What's the basis for that in the record? The evident partiality? No, that this was an unreasonable award, which is what you said the whole purpose is for everybody to get together and try to reach one. Well, it was an unreasonable award. Where does somebody say, I wouldn't have participated in this award if I'd known he had done this or had this relationship with ICA? But once the award was rendered, Your Honor, the panel became functus officio. It was no longer in existence, so there's no one to come back and say, hey, we now have the power to revisit. What we're looking for is what basis is there for thinking that, for instance, if the business relationship such as it was between ICA and Venture had been disclosed, if the dual roles played by Mr. Rios had been disclosed, that would have afforded a particular argument that would have made this outcome unlikely. I mean, as I understand your adversary, it's that those facts are unrelated to the issues that had to be decided, and that's why there's really no harm here from the nondisclosure. Tell us why we shouldn't agree with that. Let me start with this, because at the organizational meeting, I asked him what his relationship was with ICA before the panel was constituted. He said nothing. Other than something 10 years prior to the organizational meeting, he had no contact with ICA. If he had disclosed that he had a leased employment agreement, if he had disclosed that he was in other ventures with principals of ICA, like Arillo, Morley, I would have said, hold on here. We have to—I probably would not have agreed to constitute the panel. We would have gotten— Was that your call at that point in time? I don't know, and I can't find it in the contract. Could you have said, I object to that arbitration? Absolutely, I could have called. And what is the authority for giving power to your objection? Well, the authority is that— Is it custom? Well, basically it is. And it's not in the contract. It's not in the contract. It's not in the contract. Nobody makes a decision if one side objects to the other side's arbitrator. I would say this. It happens, but not often. It's rare. Isn't that a problem for your case, though? Why is that? I'm asking the question. Oh, okay. No, I didn't understand. Oh. I didn't understand. Isn't it a problem that there isn't a basis for—and you were right to ask the question. Isn't it a problem if there is no contractual basis that gives power to your objection to an arbitrator for determining whether your objection should be honored? But we want the arbitrators and the umpire to be disinterested. No, no, no. I totally understand all of that. But if you say I object and the arbitrator to whom you object or of whom you object says, well, sorry, I'm still staying here, and the side that has appointed that arbitrator says, no, we're going to keep him in here. You understand what his problems are, but we're not getting rid of him, there's nothing you can do about it, is there? Yes. I would go to court and seek relief to enjoin them from proceeding. With that arbitration with that arbitrator? Correct. You're not objecting to the arbitration just to the power? Correct. You would say that this arbitrator in this particular case is not disinterested. Correct. And that means that the word disinterested entails something more than having an interest in the outcome of the arbitration. It's more than the interest, the pecuniary interest in the outcome. Correct. It's more than that. Correct. Correct. Because you see, everyone who is participating in these arbitrations, people often have a lifetime of experience. That's why they're appointed as arbitrators, and they've done business with this one and that one. They've done business with everybody. They've reinsured everybody and they've ceded to everybody. Everybody has existing relationships. And so the term disinterested probably means something a lot more narrow than the fact that there are prior and even current business relationships. Correct. Correct. Correct. And because we want to avoid situations like this where you find out after the fact of these relationships, that's why you encourage, you require disclosure in order to move forward with the arbitration process. Where would we look to find what the meaning is of the word disinterested and find support for your view that it is something other than having, something other than just having an interest in the financial outcome of the arbitration? I think that to some degree Commonwealth Codings provides some guidance along with some of the decisions that have come out of the Second Circuit, such as Scandinavian Re. It doesn't address it directly, but I think they give some guidance as to what disinterested should be. Thank you. Thank you, Your Honor. I just want to address a couple of points quickly. Number one, I thought I heard Mr. Stalker say that he thought that if he objected to a party-appointed arbitrator or a neutral, I guess, for that matter, that he could basically hold the arbitration hostage. This Court in— Well, he said ultimately that if he objected and the objection wasn't honored, he would go to court and seek a court order for that to occur. There was a process in there. Yes, Your Honor. No, I agree with that. I didn't mean it in this sense. I just, but the process is this, according to the Aviel case in the Second Circuit, and I don't have the site on me right now, but it's easy to find. The, you have to, if you have an objection to the composition of the panel, you've got to make it at the time when there's an award. That's what the rule is. Does that seem very efficient to you? It seems very efficient, I think, Your Honor, because it may turn out that the person who would have objected to the panel's composition may end up being the winner, and it goes away. And that's the procedural. In New York, you can do it. It's a different procedure. You can do it, but you can't do it here. Your adversary said that it wouldn't be possible to go back and ask the panel if, knowing what is now known, it would have come to the same conclusion. Is that correct? Well, he's referring to the functus officio doctrine, and there is, there are certain limitations on that doctrine. It's a very old doctrine. But it applies here. Well, you can move for, I guess, in prima facie it applies it, but there could be. It applies, but it's not in the contract, is it? No. So it's part of the, it's part of the RAS rules, I'm sure, and it is part of the custom of the industry for these arbitrations, in which case I think you've conceded that the custom of the industry in these arbitrations has a role. Well, I think that the functus officio, if that's what we're talking about. That's what we're talking about. Right. But that is a legal doctrine. That has nothing to do with the RAS rules or what. In fact, you can vary functus officio by contract. You can say, you can say the panel can stay in effect. But the panel, the contract doesn't say anything about it at all. That's right. And we're talking about it as a doctrine that does impact this arbitration and the permissible procedures associated with it. And since it's not in the contract, and since both counsel believe that it is a doctrine that with or without exceptions would govern this arbitration, then why does that not mean that one can look to the custom of the industry in deciding what should go on with respect to disclosure, disinterestedness, and a whole bunch of other things? Well, look what happened here, though, Your Honor. This is an example of, I think, the limited scope of the doctrine is that these arbitrators were informed after the fact of all of these allegations. And, you know, no one has taken the, you know, no one has been sitting there claiming the functus officio doctrine to the extent that, I mean, that basically says the arbitrators can't revisit on things. But if, you know, you could ask a clarifying question. And there's a continuing obligation to disclose matters that might make you interested or even partial. I guess the question here is, in light of this custom and precedent within the industry, how can you justify that you not only can pick an interested arbitrator, but you can falsely represent that he's not interested, which is what I understand the other side to be saying happened here. Your client didn't say, yeah, I've had business dealings with the party in interest. Instead, he, the allegation is falsely denied that he had any business relationship. And so what allows you to do that? I mean, that may be Judge Hall's first question to you. If you're talking about his affidavit, he said he denied that he had any interest in the outcome of the arbitration. He denied any business relationship with ICA. Well, if he did that, you know, I don't know that he was aware of some of these older contracts. In fact, he wasn't even a CEO of the company when they came into existence. You're talking about the old contracts. The 2013 and 2014, yeah, contracts. Any business relationships with ICA? No. So, you know, I think the question is there. I mean, obviously that is a good thing. Disclosure and forthrightness on the part of every panel member is something that I'm not challenging here. What we are saying is that, you know, and let's assume, as you said, that there was a disclosure, there had been disclosure. Everybody knew about all this stuff. And let's say that Mr. Stalker objected. And let's say that he followed the procedure in the Second Circuit, and then he renewed his objection, either as an evident partiality claim to vacate the ward or as a perhaps a, you know, a Section 10A4 claim. Now, if he did that, then the question is, well, was there any interest? Was the arbitrator interested in the outcome? Now, I think what Mr. Stalker is suggesting is that disinterestedness is the same thing as impartiality. It's not. And even the ARIAS rules, which don't apply, but even the ARIAS rules say that disinterestedness, and this isn't our play brief. Why aren't the ARIAS rules integral, at least in their basic form, to every reinsurance arbitration that does not specify in detail how things will proceed in the contract? Well, you know, not everybody, not every company is a member of ARIAS. I mean, those rules are out there. Maybe there's some evidence of something. But unless my understanding of the law in this circuit, particularly in Scandinavian Re, is that, you know, all these, whatever disclosure requirements that a rule might import into the parties, it doesn't have any bearing on evident partiality unless perhaps, and Scandinavian Re left this question open too, unless it's in the contract. Just a point of fact, Ventures and Insurance Company of the Americas have the same address. Do they have the same office? At one point, and this ended in 2014, they were in the same suite of offices. Okay? It was a big office place. We showed the district court a picture of it. But that hasn't been the case for a long time. What was the suite of offices? Is this one floor of an office building or half a floor? I mean, we don't even know. They haven't sat in the record. All I know is it's a suite of offices. But they were in the same suite of offices. For a period, yes, but not anymore. I mean, certainly before the arbitration. That ended. So, you know. That's what makes the question to Mr. Campos so curious. Did you have, did you, any business relationships with ICA? And he answers no. With respect to a company that his not insignificant size company shared office space with. It's a very curious denial. It is, Your Honor. However, remember, timing is important here, too. Campos, okay. Number one, Campos was an officer or director of some 30 companies. He was based in Atlanta, not Arizona. So, you know, how much time he ever spent out in Arizona is, I mean, as a matter of, I mean, there's no evidence in the record one way or the other on it. But, you know, he has 30 some interests. That is on the record. And this is not his main interest. So he's not spending a lot of time over there. And it's not, it may be that he didn't know. I don't know. But the question here is, was he or was he not interested in the outcome of the arbitration? That standard is, it's in the Arius Rules. It's in the Trustmark case. It's taken from Supreme Court authority, Caperton, which talks about the, you know, which I think cited back to the Federalist Papers. With the denial of, with giving the answer no to the question that Judge Radgey recited from the record, nobody got to ask him whether he had any interests. And that seems to me to be the problem. No, I think Mr. Stalker asked him, do you have any interest in the outcome of the arbitration? And he said no. But that's true. Yes, but . . . I mean, interests in, you know, relationships, and there are interests. What would the consequence be if he was disinterested, as you defined the term, that is to say he wasn't going to make a dime or lose a dime, no matter how that arbitration came out, but his answers to the discovery were so evasive and wrong as to be fraudulent. Isn't there, what's the consequence? Well, I think . . . Having fraud in the organizational process of an arbitration. Your Honor, if fraud requires damage, fraud requires prejudice. If there's . . . Yes, but the only thing anybody ever wants from an arbitration is a fair outcome. And if you look at, and if the Court can look at the outcome here and say it was a fair outcome because it was based on an interpretation of the contract, why would the Court want to speculate that something . . . We find that there has been fraud when people are induced to invest their money on false representations, whether or not they made a penny or lost a penny. So they had a right to the truth in making their decision. I mean, by analogy here, to use the most obvious example of partial arbitrators, if a union picked an arbitrator and in examination said, have you ever held an office in this union, and the fellow said no, and it turned out that he had been vice president of the union five years before, had no relations now, but he had served as an officer of the union, you think that's irrelevant to then the ultimate outcome of the arbitration? I think if you could show prejudice, it would be relevant. You have to show that he would have ruled differently? I mean, that's what it takes? Otherwise, you can lie about your relationship with the party that's picking you? Not simply that you can have a relationship. You can falsely deny that you have the relationship. And there are . . . This is a situation, too, that if you're going to start basically enforcing disclosure requirements with Section 10A4, even though then you're going to . . . There's going to be an endless slew of nondisclosure cases because in most of these cases with neutrals, there's always something that the neutral didn't disclose, whether maybe he did it purposely, maybe he didn't, or she didn't. Either way. When you have a neutral or a party arbitrator, you have somebody usually who has many relationships over a long period of time, and some of them are officers or have been officers in very large companies and don't know all of the relationships. That's also an answer, isn't it? You can't be sure. I work for Worldwide Insurance, and I may have had something to do with these people over the years. But wouldn't it be odd if you said, I don't know whether we shared office space with them? Well, I think in the context of this, it's a party-appointed arbitration. Judge Easterbrook went so far as to say that disclosure really has no part in party-appointed context. I mean, it's an important right. The Court of Appeals says it's an important right. So, you know, if it's . . . So you're basically . . . If it's important . . . And it's not subject to the other . . . It's only subject to the violation of the arbitrator qualifications in the agreement. And, you know, I guess in a case where there was prejudice, and if you had fraud or something, you know, that would provide a basis for vocatory, if not under evident partiality, under Section 10A4. Judge Easterbrook talked about that, too. Thank you. Thank you both. Thank you, Your Honor. We will reserve discussion. Thank you, Your Honor.